UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MICHAEL BRANNAN, individually, as Administrator of the estate of BARBARA BRANNAN, deceased, and as Parent and Natural Guardian for his minor children S.B. and R.B., <br><br> Plaintiffs, <br><br> v. <br><br> NORTHWEST PERMANENTE, P.C.; KAISER FOUNDATION HEALTH PLAN OF THE NORTHWEST; MINDY ROTHBARD, M.D.; and MIKE G. LIN, M.D., <br><br> Defendants. | Case No. C05-5157FDB <br><br> ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO PRECLUDE DEFENDANTS' EXPERT WITNESSES |

**INTRODUCTION**

Plaintiffs move to preclude, pursuant to Fed. R. Civ. P. 702, the testimony of certain of Defendants' experts on the basis that they opine, without offering evidence to support their denials, that amphetamine salts (Adderall) could not have killed Mrs. Brannan. Plaintiffs seek to preclude such testimony from Dr. William J. Brady, Dr. Anne R. Neddrow, Dr. Csaba Hegyvary, Dr. Michael P. Resnick, and Ali J. Olyaei, Ph..D. Plaintiffs emphasize that with the exception of Ali Olyaei, they do not seek total preclusion of Defendants experts; rather only that part of their proffered testimony that is beyond the scope of their expertise or that is not germane to this case.

ORDER - 1

Barbara Brannan died July 16, 2002, at 39 years of age, during a family outing to Mt. St. Helens. The allegations arise based upon decedent Barbara Brannan's ingestion of generic amphetamine salts (the generic equivalent of Adderall), which were prescribed for her by Dr. Mindy Rothbard, a psychiatrist, to whom she was referred by Dr. Michael G. Lin, an internal medicine physician. Following an autopsy, the Cowlitz County coroner attributed Mrs. Brannan's death to "myocardial fibrosis and the amphetamine effect" of the generic Adderall taken in accordance with the dosage instructions of Dr. Mindy Rothbard. Plaintiffs allege medical negligence in improperly prescribing the amphetamine salts in disregard of the decedent's cardiac condition clearly contained in her prior medical records available to the Defendants in her chart. Plaintiffs allege that the amphetamine salts were prescribed without reviewing the decedent's blood pressure or any other cardiovascular exam, and that less than two weeks later, without any physical monitoring by either doctor, the prescription was refilled, at double the dosage and with a 90-day supply, based only on a telephone call initiated by the decedent and without a direct meeting between doctor and patient.

## STANDARD OF REVIEW

**Expert Qualifications**

To be considered an expert witness in a medical malpractice case, the witness (1) must be qualified and (2) must offer useful testimony. *Reese v. Stroh*, 128 Wash.2d 300, 303, 907 P.2d 282 (1995). A standard-of-care expert must be reasonably familiar with the practices of a reasonably prudent practitioner.

To prove negligence, the plaintiffs must demonstrate that defendants failed to exercise the degree of care, skill, and learning expected of a reasonably prudent health care provider at the time in the profession or class to which he or she belongs in the state of Washington, acting in the same or similar circumstances. RCW 7.70.040(1). Expert testimony is required to establish most aspects of causation in a medical malpractice action. *Seybold v. Neu*, 105 Wash. App. 666, 676 (2000). Expert testimony may not be based on speculation or conjecture; an expert must testify to his or her

ORDER - 2

conclusions to a "reasonable degree of medical certainty." *McLaughliin v. Cooke*, 112 Wash.2d 829, 836, 774 P.2d 1171 (1989).

**Expert Opinion Testimony**

Regarding experts testifying in the form of an opinion or otherwise, F.R.E. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), a trial court must act as a "gatekeeper" as to the admission of expert scientific testimony and must conduct a preliminary assessment to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. *Daubert* requires a court to consider whether (1) the reasoning or methodology underlying the testimony is scientifically valid (reliability) and (2) whether the reasoning or methodology can properly be applied to the facts at issue (relevancy). *Id.* at 592-93.

In determining relevance a court must consider the applicable substantive standard. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1320 (9th Cir. 1995)(*Daubert II*). Under Washington tort law, a plaintiff must show that the "act complained of 'probably' or 'more likely than not' caused the subsequent disability." *Schudel v. General Electric Co.*, 120 F.3d 991, 996 (9th Cir. 1997)(quoting *O'Donoghue v. Riggs*, 73 Wash.2d 814, 824, 440 P.2d 823 (1968)).

In determining reliability, a court may consider whether the theory (1) can be or has been tested, (2) subjected to peer review and publication; (3) a scientific technique's known or potential rate of error; (4) the existence and maintenance of standards and controls, and (5) whether the theory or methodology employed is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. "A court may conclude that there is simply too great an analytical gap between the

ORDER - 3

data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). In *General Electric*, the court responded to Respondent Joiner's urging that the focus must be on principles and methodology, not on the conclusions that they generate:

> But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.*

## DISCUSSION

### Dr. William J. Brady, Pathologist

Plaintiffs object to Dr. Brady's testimony that Mrs. Brannan died for an "undetermined reason" but that in his opinion, "... the ingestion of Adderall was not the cause of Ms. Brannon's death. She had taken this medication for some weeks before her death with no evident problems and I am unwilling to speculate that for no demonstrable reason it now suddenly caused her to die." Plaintiffs also object to Dr. Brady's not considering the coroner's findings of interstitial fibrosis and perivascular myocardial fibrosis to be "significant," as this testimony is beyond Dr. Brady's expertise and based on his review of a small tissue sample. Thus, Plaintiffs argue that Dr. Brady should be precluded from testifying as to: (1) his personal belief that Adderall was not the cause of Mrs. Brannan's death; (2) causation in general; and (3) the extent of Mrs. Brannan's myocardial fibrosis.

Defendants argue that Dr. Brady is an expert in autopsies and death investigations, that he thoroughly investigated and personally reviewed all relevant materials and concluded that Mrs. Brannan's cause of death could not be determined with medical certainty. Moreover, he need not be a cardiologist to opine about cardiac pathology.

Dr. Brady's testimony will not be precluded as requested by Plaintiffs. Dr. Brady's conclusion rests, among other things, on his experience of over 50 years of autopsying and reviewing

ORDER - 4

cases of fatal cardiomyopathy [Meyerson Dec. Ex. A, p. 6], what Dr. Clifford Nelson (the doctor who conducted the autopsy on Mrs. Brannan) described in his report, and what Dr. Brady found in his microscopic examination of Dr. Nelson's tissue slides. A pathologist may certainly express his opinion as to cause of death as a matter within his expertise in pathology. The pathologist may take note of the condition of the cardiac system and he may form an opinion as to any effect of a drug under the circumstances presented to him, considering patient history and the pathological evidence. Dr. Brady concluded that "for an undetermined reason, [Mrs. Brannan] suffered an electrical disturbance in her heart that produced a cardiac arrest," and that sometimes the reason for the disturbance cannot be determined. He further stated, after review of the physical condition of her heart muscle and her medical history, that he was "unwilling to speculate" that her ingestion of Adderall caused her to die. [Meyerson Dec. Ex. A, 6–8.] While a cardiologist may or may not come to a different conclusion based upon more substantive expertise in this specialty, a pathologist is entitled to render an opinion based on his expertise in his specialty and the evidence presented to him in the particular case. For these reasons, Plaintiffs' motion as to Dr. Brady will be denied.

**Dr. Anne R. Nedrow, Internist**

Plaintiffs object to Dr. Nedrow's testimony because while she stated at her deposition and in her expert report that she was only concerned with the standard of care of an internist and would not be offering an opinion as to the cause of Mrs. Brannan's death because she did not know what Mrs. Brannan died from, she goes on to opine that Mrs. Brannan's ECG (showing a left bundle branch block (LBBB) did not require Dr. Lin to follow up with a cardiac referral or evaluation because an LBBB in a 39 year-old woman is benign rather than pathological. Plaintiffs contend that Dr. Nedrow also improperly attempts to rebut Plaintiffs' cardiologist, Dr. Nicholas DePace and improperly opines as to the significance of the autopsy findings.

Defendants respond that internists specialize in diagnosing and treating diseases of the body's internal organs, including the heart, and that Dr. Nedrow's testimony is properly confined to the

ORDER - 5

significance – to an internist – of certain medical facts. Dr. Nedrow's reference to one patient's experience with an LBBB was to strengthen her conclusion that routine cardiac evaluations are not necessary under the circumstances presented. Dr. Nedrow's opinion was based on her knowledge and experience and not simply on one item of anecdotal evidence.

Dr. Nedrow's testimony will not be precluded as requested by Plaintiffs. Dr. Nedrow is qualified to render her opinion as to the standard of care required of an internist in the presence of certain medical conditions. An internist testifying as to the standard of care in a case implicating the heart simply must refer to the condition in rendering an opinion on appropriate conduct for a reasonably prudent internist under the circumstances in the state of Washington. Plaintiffs' Motion as to Dr. Nedrow will be denied.

**Dr. Csaba Hegyvary, Psychiatrist and Neurologist**

Plaintiffs object to Dr. Hegyvary's testimony when he opines as to the safety of Mrs. Brannan's dosage of Adderall and the cause of her death because it is outside his expertise. Plaintiffs argue that he is neither a cardiologist nor a pathologist, yet he improperly opines as to Mrs. Brannan's LBBB, the extent of the fibrosis found in her heart conduction system at autopsy, and whether the fibrosis would have been found if Dr. Lin had ordered a cardiological work-up. Plaintiffs also argue that Dr. Hegyvary improperly gives personal opinions that the cause of death was not Adderall and makes comments on the effect of altitude and climate at Mt. St. Helens when Mrs. Brannan suffered cardiac arrest.

Defendants argue that Dr. Hegyvary may render an opinion on the reasonableness of psychiatrist Dr. Mindy Rothbard's care. Defendants also note that Dr. Hegyvary has experience in Hungary as a pathologist. Defendants offer no information as to the usefulness of Dr. Hegyvary's qualifications as a neurologist in this case nor on the appropriateness of the altitude and climate comments.

ORDER - 6

1  Plaintiffs' objections to Dr. Hegyvary are well taken as to his testifying as a pathologist, as
2  Defendants offer no argument with respect to his qualifications to testify as to the standard of care of
3  a pathologist in the state of Washington during the relevant time period.  Apparently, Defendants
4  primarily seek Dr. Hegyvary to testify as to the standard of care of a psychiatrist under the
5  circumstances during the relevant time period in Washington, and such testimony will be allowed.
6  Plaintiffs' motion as to Dr. Hegyvary will be granted as to his testifying as a pathologist or
7  pharmacologist and as to his speculation as to cause of death and his observations as to altitude and
8  climate at Mt. St. Helens at the time of Mrs. Brannan's death.  Dr. Hegyvary may testify as to the
9  standard of care of a psychiatrist in Washington state.

10  **Dr. John Rudoff, Cardiologist**

11  Plaintiffs object to the testimony of Dr. Rudoff because he cannot testify with any degree of
12  medical certainty as to what caused Mrs. Brannan's death, and he, therefore should not be allowed to
13  testify that "it is possible that [Mrs. Brannan] died of ventricular arrhythmia of whatever cause, and
14  other electrical abnormalities are also possible."  Plaintiffs also assert that Dr. Rudoff should not be
15  allowed to testify as to the standard of care for an internist.

16  Defendants argue that Dr. Rudoff may opine as to cardiac abnormalities, diseases, and
17  outcomes and may explain Mrs. Brannan's heart condition from the available records.  Defendants
18  do not suggest that Dr. Rudoff will testify as to the standard of care of an internist.

19  Plaintiffs' arguments as to Dr. Rudoff are not well taken.  As stated earlier, expert testimony
20  may not be based on speculation or conjecture; an expert must testify to his or her conclusions to a
21  "reasonable degree of medical certainty."  *McLaughliin v. Cooke*, 112 Wash.2d 829, 836, 774 P.2d
22  1171 (1989).  If the evidence available to a qualified expert is such that he cannot testify as to the
23  cause of death to a "reasonable degree of medical certainty," then that is his opinion and he may
24  render it.  Plaintiffs' motion as to Dr. Rudoff will be denied and Dr. Rudoff may testify as to
25  causation in this case.

26  ORDER - 7

**Dr. Michael P. Resnick, Psychiatrist and Neurologist**

Plaintiffs argue that Dr. Resnick, an addiction psychiatrist, improperly opines as to what significance anesthesiologists at the University of Washington attributed to Mrs. Brannan's LBBB in 2000 when she underwent a series of sinus surgeries and that he further improperly opined that their actions indicated that a cardiac work-up by Dr. Lin was not required in June 2002. Plaintiffs also object to Dr. Resnick's opinions as to the pharmacological effect of the amphetamine salts on Mrs. Brannan's blood pressure being "insignificant," and that Dr. Rothbard did not cause or contribute to Mrs. Brannan's death.

Defendants argue that Dr. Resnick, as an addiction psychiatrist, works extensively with both psychiatric prescriptions and the effects of drugs, and that he need not be a pharmacologist to address the workings of psychiatric medications. Dr. Resnick, an associate professor of psychiatry and the director of psychiatric education for multiple teaching hospitals, is qualified to give testimony on whether there was a violation of the standard of care that caused Mrs. Brannan's death.

Dr. Resnick appears to be qualified to opine as to the standard of care for a psychiatrist under the circumstances of this case, although it is not clear that is how Defendants intend to use him, given that they also have Dr. Hegyvary on this subject. Nevertheless, Dr. Resnick is qualified to testify as an addiction psychiatrist as to the workings of psychiatric medications and to render his opinion within his specialty as to the effect of amphetamine salts (Adderall) on Mrs. Brannan. Plaintiffs' motion as to Dr. Resnick will be denied.

**Dr. Ali Olyaei, Ph.D, Pharmacologist**

Plaintiffs object to Dr. Alyaei improperly giving opinions (1) as to whether it was appropriate for Dr. Rothbard to approve an increased dosage of amphetamine salts and to have done so over the telephone without first conducting a physical evaluation of Mrs. Brannan; (2) about cardiac fibrosis and LBBB and the use of Adderall, Mrs. Brannan's level of hypertension, and whether she had any medical contraindications to Adderall; (3) the subsequent FDA approval of Adderall for adults

ORDER - 8

establishing its safety and efficacy. Plaintiffs argue that Dr. Alyaei's testimony should be precluded in its entirety as not relevant or proper.

Defendants respond that Dr. Olyaei, while not a medical doctor, is a pharmacologist. Pharmacology is the study of drug composition and properties, including interactions toxicology, therapies, medical applications, and how medications affect the body. Defendants argue that Dr. Olyaei is qualified to discuss matters of pharmacy (including appropriate prescribing of medication) and pharmacology (how medications work and affect the body). Since the workings of Adderall and how this medication affects the body are at issue in this matter, Defendants contend that the testimony of Dr. Olyaei, based on peer reviewed medical literature and science, will be helpful and necessary.

Plaintiffs' objections to Dr. Olyaei are in part well taken. Dr. Olyaei may not testify as to whether Dr. Rothbard appropriately prescribed Adderall to Mrs. Brannan, as this implicates the standard of care for a psychiatrist. Dr. Olyaei may testify as to the effects of Adderall on the body and what medical contraindications for the use of Adderall were known at the relevant time in 2002 to a reasonable medical certainty when the medication was prescribed to Mrs. Brannan. This testimony is within Dr. Olyaei's expertise as a pharmacologist, and although it may implicate the standard of care, that implication is for another expert's testimony. As to the subsequent approval of Adderall for adult use and its safety and efficacy, Dr. Olyaei may testify on this subject, as it is within his expertise. The Court notes that Defendants declare that Dr. Olyaei's opinions are based on peer reviewed medical literature and science admissible under *Daubert*. Plaintiffs' motion as to Dr. Olyaei is granted in part and denied in part.

ORDER - 9

**CONCLUSION**

Plaintiffs' Motion to Preclude Expert Testimony is granted in part and denied in part as discussed above. ACCORDINGLY,

IT IS ORDERED: Plaintiffs' Motion To Preclude Defendants' Expert Witnesses [Dkt. # 81] is GRANTED in part and DENIED in part as set forth above.

DATED this 25th day of September, 2006.

FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

ORDER - 10