1

Honorable Franklin D. Burgess

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE WESTERN DISTRICT OF WASHINGTON

11

12 | MICHAEL BRANNAN, Individually, as Administrator of the estate of BARBARA BRANNAN, deceased, and as Parent and Natural Guardian for his minor children STEPHANIE BRANNAN and RHIANNON BRANNAN,

No. 05-5157 FDB

13

14

DEFENDANTS' TRIAL BRIEF

15

Plaintiffs,

16

vs.

17 | NORTHWEST PERMANENTE, P.C.; KAISER FOUNDATION HEALTH PLAN OF THE NORTHWEST; MINDY ROTHBARD, M.D.; and MIKE G. LIN, M.D.,

18

19

Defendants.

20

## I. INTRODUCTION.

21

Plaintiff Michael Brannan is the surviving spouse of Barbara Brannan who died

22

suddenly on July 16, 2002.  Stephanie and Rhiannon Brannan are the surviving minor

23

children.  Mr. Brannan brings his claims as the personal representative of his wife's estate,

24

on his own behalf, and as guardian for his minor children.

25

26

27

DEFENDANTS' TRIAL BRIEF - 1
S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

28

BURGESS FITZER, P.S.
ATTORNEYS AT LAW
1145 BROADWAY STREET, SUITE 400
TACOMA, WASHINGTON 98402-3584
(253) 572-5324    FAX (253) 627-8928

1    Defendant Dr. Mike Lin was the primary care provider for Ms. Brannan between

2    October 2001 and the time of her death. Defendant Dr. Mindy Rothbard was Ms. Brannan's

3    treating psychiatrist for mental health issues, including Attention Deficit Hyperactive

4    Disorder ("ADHD").  Both doctors were employed by Defendant Northwest Permanente in

5    Vancouver, Washington.

6    Plaintiffs contend that Adderall was contraindicated for Mr. Brannan. Defendants

7    refute this contention. Plaintiffs further claim that Adderall caused Ms. Brannan's death.

8    The centerpiece of plaintiffs'  claim is the alleged negligence  of Dr.  Lin and/or Dr.

9    Rothbard in failing  to do a cardiac evaluation for  an asymptomatic cardiac conduction

10    condition of left branch bundle block ("LBBB") which had been discovered by Ms.

11    Brannan's prior treating providers at Harborview Medical Center. Contrary to the plaintiffs'

12    contentions,  the evidence will show that Drs. Lin and Rothbard complied with the standard

13    of care in their treatment of Ms. Brannan.  Importantly, even if a cardiac evaluation had been

14    obtained prior to the prescribing of Adderall it would not have detected the cardiac pathology

15    found at autopsy following Ms. Brannan's death.  Further, in terms of medical probability,

16    the cause of Ms. Brannan sudden cardiac death cannot be determined.  As a result, the

17    defendants expect a verdict in their favor.

18    **II. STATEMENT OF THE CASE.**

19    **A.       Events Leading up to Ms. Brannan's Demise.**

20    On the day of her death, July 16, 2002, Barbara Brannan was a 39 year old married

21    woman with two children, Rhiannon, age 12 years and Stephanie, age 10 years. Ms. Brannan

22    had a long history of  medical problems and had treated with several health care

23    professionals during her adult life.  Within the last five years of her life, these health

24    professionals included persons at Harborview Medical Center and the Salmon Creek Medical

25    Office of Defendant Northwest Permanente, P.C. (hereinafter referred to as "Salmon

26

27    DEFENDANTS' TRIAL BRIEF - 2
      S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

28

1   Creek"). Some of Ms. Brannan's medical problems within the five years before her death

2   included back injury and related surgery, a long history of chronic sinusitis with four sinus

3   surgeries in 2000, ectopic surgery in 1998, and depression. Over these same years, Ms.

4   Brannan smoked somewhere between one to four packs of cigarettes a day and was obese.

5          In January 2000, an EKG was taken at Harborview Medical Center incidental to Ms.

6   Brannan's sinus surgery. The EKG was interpreted as "abnormal" by the computer generated

7   report. Her treating providers did not believe a cardiac evaluation was necessary as Ms.

8   Brannan did not have any cardiac symptoms. That surgery, and many subsequent surgeries,

9   went forward under general anesthetic without any problems.

10         From October 2001 to the time of her death, she was treated by Defendant Dr. Mike

11  Lin, an internist employed by Northwest Permanente. Although Dr. Lin referred Ms.

12  Brannan to various sub-specialities within the Salmon Creek facility, he was her primary care

13  physician and he treated her for various physical problems. Dr. Lin also prescribed and

14  monitored pain and other medications for Ms. Brannan. While Dr. Lin was aware of Ms.

15  Brannan's LBBB she never complained of or exhibited any cardiac or cardiovascular

16  symptoms.

17         In May 2002, Ms. Brannan complained of symptoms of ADHD or attention deficient

18  disorder ("ADD") and relayed a history of this diagnosis as a child. Upon referral by Dr. Lin

19  Ms. Brannan saw Ms. DuBoff on May 24, 2002 for a mental health evaluation. Ms. DuBoff's

20  assessment was ADHD as well as adjustment disorder with depressed mood and chronic

21  pain. Ms. DuBoff suggested that stress management and medication should be considered,

22  as well as couple counseling to resolve partner issues.   Ms. Brannan was referred to

23  Defendant Dr. Mindy Rothbard, a psychiatrist for further evaluation.

24         On June 13, 2002, Dr. Rothbard conducted a psychological evaluation. Based on

25  her evaluation, Dr. Rothbard concluded that Ms. Brannan did have ADHD and prescribed

26  DEFENDANTS' TRIAL BRIEF - 3
27  S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

BURGESS FITZER, P.S.
ATTORNEYS AT LAW
1145 BROADWAY STREET, SUITE 400
TACOMA, WASHINGTON 98402-3584
(253) 572-5324   FAX (253) 627-8928

28

1    a trial course of amphetamine salts, Adderall, to be taken "one tablet by mouth every

2    morning for 3 days, then 1 tablet every morning and 1 tablet midday." The prescription was

3    properly filled at the Salmon Creek pharmacy.

4              On June 26, 2002, Ms. Brannan called Dr. Rothbard and reported that she was doing

5    better, was more focused, and had increased her dosage. Dr. Rothbard issued a new Adderall

6    prescription for 90 days with directions to take 40 mg per day, and confirmed that Ms.

7    Brannan would follow up with Ms. DuBoff for counseling.

8              While visiting Mount St. Helens with her family on July 16, 2002 Ms. Brannan

9    collapsed and later died. An autopsy performed by Dr. Clifford Nelson concluded that Ms.

10   Brannan died of a "cardiac dysrhythmia" due to fibrosis and amphetamine effect.

11   **B.      Northwest Permanente' Corporate Status.**

12             Plaintiffs consistently want to call Defendant Northwest Permanente by a trade name

13   known as "Kaiser Permanente." Their intentions are to prejudice the jury by use of this trade

14   name that encompasses a multi-state organization of health care facilities. Each facility is

15   a separate entity and should be judged separately and individually. The Salmon Creek

16   facility should be judged based on its actions, not on the actions of the entire network of

17   health care facilities under the Kaiser Permenente trade name umbrella.

18   **C.      Expert Witnesses.**

19             By a cursory review of the Pretrial Order, the court can note that there are numerous

20   expert witnesses. Each expert will testify as to a separate aspect of this case and no

21   overlapping is expected or intended. **Dr. Csada Hegyvary** will testify regarding the

22   standard of care for psychiatrists in Washington. **Dr. Ali Olyaei** will discuss the

23   pharmacological aspects of Adderall, the effects on the human body and what was known

24   about the prescription of Adderall for adults in 2002. **Dr. Anne Nedrow** is an internist who

25   will discuss the standard of care for internists, such as Dr. Lin, in the State of Washington.

26   DEFENDANTS' TRIAL BRIEF - 4
     S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

27

28

BURGESS FITZER, P.S.
ATTORNEYS AT LAW
1145 BROADWAY STREET, SUITE 400
TACOMA, WASHINGTON 98402-3584
(253) 572-5324    FAX (253) 627-8928

**Dr. Michael Resnick** specializes in addiction and will discuss the appropriate dosage of Adderall for an adult meeting Ms. Brannan's description and condition, including the propensity for addiction or abuse of this drug. **Dr. William Brady** is a forensic pathologist and will discuss his opinions regarding Ms. Brannan's physical condition and the time of her death and will opine on the cause of her death. **Dr. John Rudoff** is a cardiologist who will discuss the LBBB condition and associated cardiac abnormalities in general and specific to Ms. Brannan.

The defendants will call economic experts: **Dr. David Knowles** who will discuss his opinions on the economic loss to Ms. Brannan's estate and **Rich Carroll** who will offer testimony on the use and cost of annuities.

Finally, **Dr. Daniel Close** will discuss his opinions regarding Asperger's Syndrome and his evaluation of Rhiannon. This testimony will address damage issues pertaining to the minor children, alleged learning disabilities, and the need for specialized education.

## VI.  ISSUES

The jury will ultimately have to decide the following issues regarding the hospital:

1. Was Dr. Lin negligent?

2. Was Dr. Rothbard negligent?

3. Was Northwest Permanente negligent?

4. Was this negligence, if any, a proximate cause of Ms. Brannan's death?

5. Did Stephanie and/or Rhiannan see the death of their mother to the extent necessary to meet the burden of proof for a NEID claim?

6. What is the nature and extent of the damages, if any, for Ms. Brannan's estate, for her surviving family?

## IV.  LEGAL ANALYSIS.

### A.    General Law Governing Medical Malpractice Actions.

DEFENDANTS' TRIAL BRIEF - 5
S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

BURGESS FITZER, P.S.
ATTORNEYS AT LAW
1145 BROADWAY STREET, SUITE 400
TACOMA, WASHINGTON 98402-3584
(253) 572-5324    FAX (253) 627-8928

RCW 7.70 provides the substantive and procedural framework for "all civil actions . . . for damages for injury occurring as a result of health care." The only methods of recovery are found in RCW 7.70.030:

> "No award shall be made in any action or arbitration for damages for injury occurring as the result of health care which is provided after June 25, 1976, unless the plaintiff establishes one or more of the following propositions:
>
> > (1)   That injury resulted from the failure of a health care provider to follow the accepted standard of care;
> >
> > (2)   That a health care provider promised the patient or his representative that the injury suffered would not occur;
> >
> > (3)   That injury resulted from health care to which the patient or his representative did not consent.
>
> Unless otherwise provided in this chapter, the plaintiff shall have the burden of proving each fact essential to an award by a preponderance of the evidence."

The propositions for recovery in (2) and (3) are not part of plaintiff's case herein.

**B.   Plaintiff Must Establish the Standard of Care for Negligence and that the Defendant Breached this Standard of Care.**

**1.   Statutory Requirements.**

RCW 7.70.040 states:

> "Necessary elements of proof that injury resulted from failure to follow accepted standard of care. The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:
>
> > (1)   The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider in the profession or class to which he belongs, in the State of Washington, acting in the same or similar circumstances;
> >
> > (2)   Such failure was a proximate cause of the injury complained of."

**2.   Expert Medical Testimony is Required.**

DEFENDANTS' TRIAL BRIEF - 6
S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

1    Medical negligence must be established by showing, through expert testimony, a

2    departure from a recognized standard of practice applicable to the situation involved.

3    *Stafford v. Hunter*, 66 Wash.2d 269, 401 P.2d 986 (1965); *Ball v. Mudge*, 64 Wash.2d 247,

4    391 P.2d 201 (1964); *Richison v. Nunn*, 57 Wash.2d 1, 340 P.2d 793 (1959); *Shoberg v.*

5    *Kelly*, 1 Wash. App. 673, 463 P.2d 280 (1969). The case of *Swanson v. Brigham*, 18 Wash.

6    App. 647, 651, 571 P.2d 217 (1977), set forth the requirements that must be met by plaintiff:

7        "Absent special exceptions, a plaintiff patient must establish the standard of
         professional practice at the time of the alleged injury and a violation of that
8        standard, through the testimony of the professional equals of the defendant
         physician. *Miller v. Kennedy*, 11 Wash. App. 272, 522 P.2d 851 (1974), *aff'd*
9        85 Wash. 2d 151, 530 P.2d 334 (1975); *Jankelson v. Cisel*, 3 Wash. App.
         139, 473 P.2d 202 (1970)."

10   *Accord Huttner v. Mackay*, 48 Wash.2d 378, 386, 293 P.2d 766 (1956); *Skodje v. Hardy*,

11   47 Wash.2d 557, 559, 288 P.2d 471 (1955).

12       In affirming judgment for the defendant, the Court in *Harris v. Groth*, 99 Wash.2d

13   438, 663 P.2d 113 (1983) held:

14       "In general, expert testimony is required when an essential element in the
         case is best established by an opinion, which is beyond the expertise of a
15       layperson. [Citation omitted.] Medical facts in particular must be proven
         by expert testimony unless they are "observable by [a layperson's] senses
16       and describable without medical training." Thus, expert testimony will
         generally be necessary to establish the standard of care and most aspects
17       of causation.  . . .   This will remain true even under the reasonable
         prudence standard of care, since the factual question of whether a
18       particular medical practice is reasonably prudent is generally neither
         observable by or describable by a layperson.
19   *Id.* at 451 (citations omitted).

20       Additionally, other health care providers' testimony that they would have followed

21   a different course of treatment, handled the patient differently, or disagreed as to what the

22   care should have been, does not prove negligence. *Versteeg v. Mowrey*, 72 Wash.2d 754,

23   455 P.2d 540 (1967); *Stone v. Sisters of Charity*, 2 Wash. App. 607, 476 P.2d 299 (1970).

24   Health care providers are not liable for an error of judgment if they exercised reasonable care

25

26   DEFENDANTS' TRIAL BRIEF - 7
27   S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

28

and skill in arriving at that decision. *Miller v. Kennedy*, 91 Wash.2d 155, 588 P.2d 734 (1978). Similarly, an unfortunate result or complication is not *per se* evidence of negligence. Furthermore, health care providers are not to be judged in the light of any after-acquired knowledge, and the question of whether or not the health care provider exercised reasonable care and skill is to be determined by reference to what is known at the time of treatment and the pertinent facts then in existence of which it knew, or in the exercise of ordinary care it should have known. *Meeks v. Marx*, 15 Wash. App. 571, 550 P.2d 1158 (1976).

Accordingly, in order to prevail, the plaintiff must establish through expert medical testimony that defendants breached the applicable standard of care. *Swanson*, 18 Wash. App. at 651; *Harris*, 99 Wash.2d at 451, 663 P.2d 113 (1983); *Adams v. Richland Clinic*, 37 Wash. App. 650, 654-56, 681 P.2d 1305 (1984). Defendants cannot be held liable simply because this patient suffers from an unfortunate medical outcome. *Watson v. Hockett*, 107 Wash.2d 158, 164, 727 P.2d 669 (1986).

Defense experts will testify that Kaiser, Dr. Lin and Dr. Rothbard met the standard of care in relation to Ms. Brannan.

**C.     Plaintiff Must Show by Expert Testimony that any Alleged Breach of the Standard of Care Proximately Caused the Plaintiff's Injuries.**

Expert medical testimony is necessary to show that the plaintiff's injury was proximately caused by the alleged negligence. The term "proximate cause" means a cause which, in a direct sequence, unbroken by any new independent cause, produces the injuries complained of and without which such injuries would not have happened. *Alger v. Mukilteo*, 107 Wash.2d 541, 730 P.2d 1333 (1987). In all personal injury actions, the plaintiff must prove the causal relationship between the acts of defendant and the injuries for which the relief is sought. *Moyer v. Clark*, 75 Wash.2d 800, 454 P.2d 374 (1969); *Ferrin v. Donnelefeld*, 74 Wash.2d 283, 444 P.2d 701 (1968). This link is the limitation that courts

DEFENDANTS' TRIAL BRIEF - 8
S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

1   have placed upon an actor's responsibility for the consequences of his conduct. W. Prosser,

2   *Laws of Torts*, Section 236, 4th ed. (1971). The testimony must be sufficient to establish that

3   the injury-inducing situation "probably" or "more likely than not" was the cause of the

4   subsequent condition. Testimony to the effect that defendant's acts "might have," or "could

5   have," or "possibly did," cause the condition is insufficient. The case of *O'Donoghue v.*

6   *Riggs*, 73 Wash.2d 814, 440 P.2d 823 (1968), amply sets forth the type of medical testimony

7   which is required:

8       "In a case such as this, medical testimony must be relied upon to establish
         the causal relationship between the liability-producing situation and the
9        claimed physical disability resulting therefrom. The evidence will be
         deemed insufficient to support the jury's verdict, if it can be said that
10       considering the whole of the medical testimony the jury must resort to
         speculation or conjecture in determining such causal relationship. In many
11       recent decisions of this court we have held that such determination is
         deemed based on speculation and conjecture if the medical testimony does
12       not go beyond the expression of an opinion that the physical disability
         "might have" or "possibly did" result from the hypothesized cause. To
13       remove the issue from the realm of speculation, the medical testimony
         must at least be sufficiently definite to establish that the act complained
14       of "probably" or "more likely than not" caused the subsequent disability."

15  *Id.* at 824 (citations omitted).

16      Evidence of causation between defendants' conduct and the alleged injuries is an

17  essential element of plaintiffs' action. RCW 7.70.040(2). Only a medical expert can

18  establish causation. *Bennett v. Department of Labor & Inds.*, 95 Wash.2d 531, 533, 627 P.2d

19  104 (1981); *O'Donoghue*, 73 Wash.2d at 824; *Harris*, 99 Wash.2d at 445. The degree of

20  proof from the expert must be sufficient to establish that more likely than not, defendants'

21  conduct was the proximate cause of the alleged injuries to avoid speculation or conjecture.

22  *See, e.g.*, WPI 105.03, 21.01.

23      Defense experts will testify that Ms. Brannan's demise was not caused by

24  defendant's conduct.

25  **D.      Northwest Permanente's Duty**.

26  DEFENDANTS' TRIAL BRIEF - 9
    S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

27

28

BURGESS FITZER, P.S.
ATTORNEYS AT LAW
1145 BROADWAY STREET, SUITE 400
TACOMA, WASHINGTON 98402-3584
(253) 572-5324     FAX (253) 627-8928

1   The duty of Northwest Permanente is best described in WPI, 105.02.01 (5th Ed.

2   2005). It has the obligation to employ healthcare providers who act as reasonably prudent

3   physicians and nurses under the same or similar circumstances. In this case, the issue

4   concerns only the care of Drs. Lin and Rothbard; no other employees of Northwest

5   Permanente.

6   **E.   Defendants are not liable simply because this patient suffered from sudden
    cardiac death, or because other physicians, in hindsight may have acted**

7   **differently.**

8   The limitations on the plaintiff's ability to recover identified above are bolstered

9   by additional case law. First, a defendant's conduct must be judged at the time of the alleged

10   malpractice. Neither speculation nor hindsight is admissible to prove a violation of the

11   standard of care. *Gjerde v. Fritzsche*, 55 Wash. App. 387 (1989); see also *Griswold v.*

12   *Kilpatrick*, 107 Wash. App. 757 (2001).

13   Second, the occurrence of an unfortunate incident, or adverse outcome, alone

14   neither produces liability nor constitutes evidence of wrongdoing. A physician cannot and

15   does not guarantee good medical results. *Watson v. Hockett*, 107 Wash.2d 158 (1986);

16   *Christensen v. Munsen*, 123 Wash.2d 234 (1994); WPI 105.07 (5th Ed. 2005), attached.

17   Third, physicians are not liable for exercise of judgment if it occurs within the

18   confines of reasonable care. *See Watson* and *Christensen, supra;* WPI 105.08 (5th Ed. 2005).

19   That is, the medical judgment of Drs. Lin and Rothbard are not measured by the character

20   of the outcome, but rather by the reasonableness of this conduct at the time in question.

21   **F.   *Res Ipsa Loquitur* Is Inapplicable to this Action**

22   Plaintiffs may not rely on the doctrine of ***res ipsa loquitur*** to circumvent their

23   statutory obligations. The doctrine is reserved for cases that are exceptional and unusual.

24   It may be appropriate in cases in which a result would not occur in the absence of negligence

25   and if there is no explanation for the occurrence of the incident.

26
    DEFENDANTS' TRIAL BRIEF - 10
27   S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

28

BURGESS FITZER, P.S.
ATTORNEYS AT LAW
1145 BROADWAY STREET, SUITE 400
TACOMA, WASHINGTON 98402-3584
(253) 572-5324    FAX (253) 627-8928

The doctrine requires the plaintiff prove three things:

1. That the occurrence producing injury was a kind that ordinarily does not occur in the absence of negligence;

2. That the instrumentality was caused within the exclusive control of the defendant; and

3. That the injury causing occurrence was not due to any contribution on the part of the injured party.

The plaintiffs will have great difficulty establishing any of these elements.   *See Tate v. Perry*, 52 Wash. App. 257, 262 (1988); *see also Andrews v. Burke*, 55 Wash. App. 622 (1989).   *Res ipsa loquitur* simply cannot be applied to the facts of this case.

**F.     There is insufficient evidence to support a claim of negligent infliction of emotional distress by Stephanie and Rhiannon.**

A recent Washington case, *Colbert v. Moomba Sports, Inc.*, 132 Wash.2d 916, 135 P.3d 485 (2006), requires that, in order to prove a NIED claim, the plaintiff must have observed the accident's immediate aftermath and effect on the victim, before third parties, such as rescuers and paramedics, substantially altered the accident scene or the victim's location or condition.   *Id.* at 931.

The children may testify that they saw was their mother's collapse, shaking and her eyes "looking funny" in the gift shop at the Mount St. Helens Monument.   Naturally, they were afraid, but Washington law for negligent infliction of emotional distress (NEID) requires more.

The tort of NEID requires "the perception of an especially horrendous event . . . The kind of shock the tort requires is the result of the *immediate aftermath* of an accident.   It may be the crushed body, the bleeding, the cries of pain, and, in some cases, *the dying words which are really a continuation of the event.*"   *Colbert*, 132 Wash.2d at 929 (emphasis in original; citations omitted).   In *Colbert*, the court required "observ[ing] the loved one in an agonized state" *Id.* at ¶ 21.   In *Hegel v. McMahon*, 136 Wash.2d 122, 125-26, 960 P.2d 424

DEFENDANTS' TRIAL BRIEF - 11
S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

1   (1998), the father saw son after a motorcycle accident and before medics arrived, with his

2   leg cut off and his body split almost in half.  Further the tort requires emotional distress

3   greater than the distress of learning about the death of a loved one.  *Colbert*, 132 Wash. App.

4   at 932 (citing *Hegel*, 136 Wash.2d at 131).

5          The reasons for these limitations of the NEID claim are well founded:

6          that unless a reasonable limit on the scope of defendants' liability is
           imposed, defendants would be subject to potentially unlimited liability to
7          virtually anyone who suffers mental distress caused by the despair anyone
           suffers upon hearing of the death or injury of a loved one. As one court stated:
8          "It would surely be an unreasonable burden on all human activity if a
           defendant who has endangered one person were to be compelled to pay for
9          the lacerated feelings of every other person disturbed by reason of it. . ."

10  *Id.* at 928 (citations omitted).   Those limitations are appropriate in this case.   If the

11  defendants are found negligent, the children have a avenue under the survival statute to be

12  appropriately compensated for their pain and suffering on their mother's unfortunate passing.

13  But to hold these defendants liable for seeing their mother collapse in a gift store would

14  violate the  parameters placed on the NEID tort.

                              **VI.  CONCLUSION**

16         The defendants will ask the jury for a verdict in their favor on the basis that the

17  plaintiffs cannot sustain their burden of proof on any of their claims.

18         DATED this _9_ day of November 2006.

19                                              BURGESS FITZER, P.S.

20

21                                              _Paula T Olson_
                                                PAULA T. OLSON, WSBA#11584
22                                              BURGESS FITZER, P.S.
                                                Of Attorneys for Defendants

23

24

25

26                                              BURGESS FITZER, P.S.
    DEFENDANTS' TRIAL BRIEF - 12               ATTORNEYS AT LAW
27  S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd   1145 BROADWAY STREET, SUITE 400
                                                TACOMA, WASHINGTON 98402-3584
                                                (253) 572-5324    FAX (253) 627-8928
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on November _9_, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.  I hereby certify that no other parties are to receive notice.

_Paula T. Olson_
PAULA T. OLSON, WSBA No. 11584
Of Attorney for Defendants
BURGESS FITZER, P.S.
1145 Broadway, Suite 400
Tacoma, Washington 98402
Telephone: (253) 572-5324
Fax: (253) 627-8928
E-mail: paulao@burgessfitzer.com

DEFENDANTS' TRIAL BRIEF - 13
S:\WP\CASES\4830\TRIAL PLEADINGS\trial brief2.wpd

BURGESS FITZER, P.S.
ATTORNEYS AT LAW
1145 BROADWAY STREET, SUITE 400
TACOMA, WASHINGTON 98402-3584
(253) 572-5324    FAX (253) 627-8928